**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **ADRIANNA SHELTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 5:22-cv-042** |
| | ) | |
| **v.** | ) | **By:   Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| **CODY MARSHALL, d/b/a C&M** | ) | |
| **TOWING AND RECOVERY, and** | ) | |
| **TRADER RICKS LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on plaintiff Adrianna Shelton's motion for default

judgment as to defendants Cody Marshall, d/b/a C&M Towing and Recovery, and Trader

Ricks LLC pursuant to Federal Rule of Civil Procedure 55(b)(2). ECF No. 12. For the reasons

provided below, the court **GRANTS** Shelton's motion.

## I.

This dispute centers around the repossession of Shelton's vehicle at her home in

Waynesboro, Virginia.[1] On March 24, 2021, Shelton purchased a 2011 Jeep Compass from

Trader Ricks LLC, a car dealership in Staunton, Virginia. Compl., ECF No. 3, at ¶¶ 3, 13–14.

Shelton made a down payment of $3,500 of the $6,000 purchase price, and financed the

remaining $2,512. Id. at ¶¶ 15–16; Buyers Order, Exh. D, ECF No. 16-2. Shelton testified at

the November 30, 2023, default judgment hearing in this action that she received several

---

[1] The facts summarized in this opinion are from the court's review of the record, along with evidence presented during the November 30, 2023, hearing on this motion.

documents from Trader Ricks at the time of purchase, including a Retail Installment Sales Contract, a Payment Schedule, and a Buyers Order. See Retail Installment Sales Contract, Exh. B, ECF No. 3-3; Payment Schedule, Exh. 1, ECF No. 13-2; Buyers Order, Exh. D, ECF No. 16-2.

Shelton proceeded to make payments on the vehicle for three months, and then entered into a written agreement with the owner of Trader Ricks—Paul Barnikow—and Christian Holloway, Barnikow's step grandson and Shelton's boyfriend at the time, providing that Holloway's lawn services at Trader Ricks satisfied three additional months of payments for Shelton, from July 2021 through September 2021, making her current on payments until October 23, 2021. Lawncare Agreement, Exh. A, ECF No. 3-2. The agreement states:

> This piece of paper is to show that Adrianna Steele Shelton has made the following payments, with the agreement that Christian Holloway would do lawn care at Trader Rick's as payment.
>
> 07/22/2021 received payment of $190.84 for July 2021 payment.
>
> 08/19/2021 received payment of $190.84 for Aug 2021 payment.
>
> 09/16/2021 received payment of $190.84 for Sep 2021 payment.
>
> The total amount received/worked for was $572.52. Adrianna Shelton's payment is not due until 10/23/2021.

Id. It is dated September 16, 2021, and was signed by Shelton, Holloway, and Barnikow. Id. However, on September 25, 2021, only 9 days after Barnikow, Shelton, and Holloway signed the agreement indicating that Shelton's next payment was not due for another month, defendant Cody Marshall and an unknown individual arrived at Shelton's home to repossess the Jeep at the direction of Trader Ricks. Compl., ECF No. 3, at ¶ 26.

Shelton testified to the events of that day as follows. Shelton—who was eight months pregnant at the time—and Holloway were at home when they heard a loud knock at the door. When Shelton and Holloway answered the door, Marshall and another individual were "very rude" and announced that they were there to repossess the Jeep. Shelton repeatedly told Marshall that she was not in default and asked them to leave. Shelton estimated that the parties argued on the front porch about the repossession for 10 minutes. During that time, Shelton recalled that Marshall and the other person were "very intense" and "aggressive."

In response to Shelton's objections, Marshall stepped into the front yard and called the Waynesboro Police Department. Two officers arrived at the house, informed Shelton that Marshall had a repossession order, and advised Marshall that he could proceed with the repossession. One of the officers informed Shelton that, because Marshall had a repossession order, Shelton was unable to do anything to stop the repossession and needed to take up the issue in court. Shelton testified that she did not understand why the officers believed that Marshall had a repossession order, given that the repossession was non-judicial so an order would not exist. She further testified that, instead of a repossession order, she was handed an informal, handwritten repossession notice from Trader Ricks purporting to accept the car as collateral in satisfaction of a debt. The notice is dated September 25, 2021 (the same day as the repossession), and states:

> Please take notice. As provided for in the Uniform Commercial Code and the code of Virginia, Trader Ricks inten[d]s to retain possession of the above mentioned vehicle in full satisfaction of the debt owed to Trader Ricks LLC until [sic] we receive written notification from you of your object [sic] within twenty-one days of the above date.

Exh. C, ECF No. 3-3. The subject line states, "Amount Owed: $2,252.20, including late fees + [$]550 Repo + [$]65 a day storage." Id. The notice is signed by Barnikow. Id. Marshall then proceeded to tow the Jeep from Shelton's backyard. Because the emergency brake was engaged, Marshall dragged the car across the yard, damaging the lawn and potentially also the car.

Shelton testified, however, that the repossession was preceded by an earlier incident with Barnikow. In the time between September 16, 2021, when Shelton, Holloway, and Barnikow signed the written lawn care agreement, and September 25, 2021, when Marshall repossessed the car, Barnikow and Holloway allegedly got into an argument regarding the proceeds of marijuana that Holloway had re-sold after buying it from Barnikow. The dispute escalated, and Barnikow informed Shelton that he would repossess her Jeep as collateral for the approximately $200–$300 that Holloway allegedly owed him. Shelton protested, informing Barnikow that he could not repossess the Jeep because she was up to date on the payments and that he could not punish Shelton for an argument that did not involve her.

Then, two or three days before the repossession, Shelton attempted to start the Jeep but was unable to. Shelton, who knew that Trader Ricks had installed a system through which it could deactivate the car remotely, called Barnikow to resolve the issue. Barnikow informed Shelton that she was behind on her payments and that he would reactivate the car if Shelton paid him. Following the repossession, Shelton testified that she called Barnikow repeatedly to address the issue given that she was not delinquent on her payments, but he was "rude" and refused to engage with her.

Shelton testified that, eight months pregnant and without a car, the repossession put her in "a complete panic." For months following the incident, she suffered from severe stress and anxiety, including associated physical symptoms such as sleeplessness and headaches, stemming from the loss of her and her then-boyfriend's sole car. Shelton's older sister, Alexandria King, similarly told the court that the repossession had taken "a big toll" on Shelton's mental health, leaving Shelton worried and stressed about the uncertainty as to how she would transport herself to prenatal appointments or to the hospital for the birth.[2] As of the November 30, 2023, hearing, Shelton had not regained possession of the Jeep, and she was unable to purchase another car until March 2022.

On July 18, 2022, Shelton initiated this action by filing a complaint, an application to proceed in forma pauperis, and a motion to appoint a process server. ECF Nos. 1–3. The court granted Shelton's motions to proceed in forma pauperis and to appoint a process server on July 20, 2022. ECF Nos. 4, 5. The U.S. Marshals Service served Trader Ricks through Lindsey Herrera, the receptionist of the LLC's registered agent, on August 2, 2022, ECF No. 7, and effected personal service on Marshall on September 8, 2022, ECF No. 8.

On October 4, 2022, due to defendants' failure to plead or otherwise defend themselves in this action, Shelton filed requests for a Clerk's entry of default under Federal Rule of Civil Procedure 55 as to both Trader Ricks and Marshall. ECF Nos. 9, 10. The Clerk entered default as to both defendants on October 5, 2022. ECF No. 11. On July 24, 2023, Shelton filed a motion for default judgment, ECF No. 13, and on November 30, 2023, the court held an

---

[2] Indeed, when Shelton went into labor, Holloway borrowed his mother's car to take Shelton to the hospital. Shelton testified that Holloway missed the birth of their child because he had to return the car to his mother. Holloway again borrowed his mother's car to take the baby home from the hospital.

in-person default judgment hearing at the federal courthouse in Harrisonburg, Virginia. Defendants did not attend the hearing, nor have they filed any pleading or otherwise appeared in the action since Shelton initiated it in July 2022.

Shelton asserts four causes of action in the complaint: (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., against Marshall for repossessing the car over Shelton's objections, (2) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., against Trader Ricks for failing to provide required disclosures in the financing agreement at the time of purchase, (3) violation of the Virginia Uniform Commercial Code ("VUCC") against Trader Ricks for repossession in breach of the peace and before default (Va. Code §§ 8.9A-601, 8.9A-609(b)(2)), and for accepting collateral in full satisfaction of the debt when Shelton had paid over 60% of the purchase price (Va. Code § 8.9A-620(e)), and (4) conversion for depriving Shelton of possession of the car against both defendants.

## II.

Federal Rule of Civil Procedure 55 ("Rule 55") "authorizes the entry of a default judgment when a defendant fails 'to plead or otherwise defend' in accordance with the Rules." United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982). Rule 55 creates a two-step process for entry of default judgment. First, the non-defaulting party must move for entry of default under Rule 55(a). See Fed. R. Civ. P. 55(a). The Clerk's interlocutory entry of default pursuant to Rule 55 "provides notice to the defaulting party prior to the entry of default judgment by the court." Hummel v. Hall, 868 F. Supp. 2d 543, 547 (W.D. Va. 2012) (citing Carbon Fuel Co. v. USX Corp., 153 F.3d 719, at *2 (4th Cir. 1998) (unpublished)).

Once the Clerk has entered default, the non-defaulting party may then move for entry of default judgment under Rule 55(b). "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing . . . ." Fed. R. Civ. P. 55(b)(1). However, "[i]n circumstances where the sum is not certain[,] . . . Rule 55(b)(2) applies, requiring that default can only be [made] by a court." Agri-Supply Co., Inc. v. Agrisupply.Com, 457 F. Supp. 2d 660, 662 (E.D. Va. 2006).

"Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint," J & J Sports Prods., Inc. v. Romenski, 845 F. Supp. 2d 703, 706 (W.D.N.C. 2012) (citing Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001)), but not any such "allegations as to damages," SEC v. Lawbaugh, 359 F. Supp. 2d 418, 422 (D. Md. 2005). Therefore, "[t]o determine whether to enter judgment on a defendant's default, the court examines whether the well-pleaded allegations in the complaint support the relief sought in the case." Old Dominion Freight Line, Inc. v. Slabway, LLC, No. 1:22-cv-164, 2023 WL 2503310, at *1 (M.D.N.C. Mar. 13, 2023) (citing Ryan, 253 F.3d at 780). If there is a sufficient basis for the judgment, then the court "must make an independent determination regarding damages." J & J Sports Prods., 845 F. Supp. 2d at 706. "While the court may conduct an evidentiary hearing to determine damages, it is not required to do so, but may rely instead on affidavits or documentary evidence in the record to determine the appropriate sum." Id.

### III.

The Clerk entered default against both defendants on October 5, 2022, ECF No. 11, and Shelton subsequently filed a motion for default judgment. ECF No. 12. The court held a default judgment hearing on November 30, 2023. Accordingly, the issue is ripe for review, and, for the reasons provided below, the court determines that default judgment is warranted for all four causes of action.

### A. FDCPA

Shelton first asserts that Marshall violated the Fair Debt Collection Practices Act ("FDCPA") for repossessing the car over Shelton's objections. Compl., ECF No. 3, at ¶¶ 52–65. To recover under the FDCPA, a plaintiff must show "(1) that she has been the object of collection activity arising from consumer debt, (2) that the defendant is a debt collector, as defined under the FDCPA, and (3) that the defendant has engaged in a prohibited act or omission." Wynne v. I.C. Sys., Inc., 124 F. Supp. 3d 734, 741 (E.D. Va. 2015). The FDCPA provides a non-exhaustive list of conduct that violates the act. 15 U.S.C. § 1692f.

Here, Shelton successfully establishes her FDCPA claim. First, Shelton plainly shows that she was the object of a collection activity arising from consumer debt, as Marshall went to her home to repossess a personal use vehicle based on purportedly outstanding debt from the purchase of that vehicle. 15 U.S.C. § 1692a(5) (defining "debt" as any obligation "of a consumer to pay money arising out of a transaction in which the . . . subject of the transaction [is] primarily for personal, family, or household purposes").

Second, Marshall is a "debt collector" under the FDCPA. Repossession agents such as Marshall, "whose only role in the debt collection process are the enforcement of security

interests, generally fall outside of the ambit of the FDCPA." Eley v. Evans, 476 F. Supp. 2d

531, 534 (E.D. Va. 2007). However, the FDCPA broadens the definition of "debt collector"

as applied to § 1692f(6), to include repossession agents:

> [A]ny person who uses any instrumentality of interstate
> commerce or the mails in any business the principal purpose of
> which is the collection of any debts, or who regularly collects or
> attempts to collect, directly or indirectly, debts owed or due or
> asserted to be owed or due another. . . . For the purpose of
> section 1692f(6) of this title, such term also includes any person
> who uses any instrumentality of interstate commerce or the mails
> in any business the principal purpose of which is the enforcement
> of security interests.

15 U.S.C. § 1692a(6); see also Eley, 476 F. Supp. 2d at 534 n. 8 ("Repossession agents and

agencies can be considered 'debt collectors,' but only as to § 1692f(6)."). Here, Shelton pleads

that Trader Ricks hired Marshall to repossess Shelton's car (i.e., to enforce Trader Ricks'

security interest). Compl., ECF No. 3, at ¶¶ 2, 7, 8. Shelton further pleads that Marshall's

conduct violated § 1692f(6), as described below. Accordingly, Shelton has established that

Marshall is a debt collector with respect to § 1692f(6) under the FDCPA.

Finally, Shelton satisfies the third element by pleading that Marshall engaged in a

prohibited act under § 1692f(6), which provides, in relevant part, that a debt collector violates

the FDCPA by taking nonjudicial action to repossess property when "there is no present right

to possession of the property claimed as collateral through an enforceable security interest."

15 U.S.C. § 1692f(6)(A). Here, Trader Ricks had no present right to possession of the Jeep

because Shelton was current on her payments through October 2021, as confirmed in writing

by Barnikow just 9 days before the repossession. Accordingly, Shelton has successfully

established an FDCPA claim and is entitled to damages.

The FDCPA allows an individual plaintiff to recover actual damages, statutory damages up to $1,000, and attorney's fees and costs. 15 U.S.C. § 1692k(a). Actual damages under the FDCPA encompass "any actual damage sustained by [the plaintiff]" because of a debt collector's failure to comply with the FDCPA, including damages for emotional distress. See, e.g., Carter v. Countrywide Home Loans, Inc., No. 3:07-cv-651, 2009 WL 1010851, at *4 (E.D. Va. Apr. 14, 2009). However, "[c]ourts are 'reluctant to award damages for emotional distress from violations of the FDCPA absent an aggrieved plaintiff receiving mental health treatment or evidence that emotional distress concretely affected a plaintiff's personal or professional life.'" Valdez v. Arm Wyn, LLC, No. 7:14-cv-263, 2015 WL 3661102, at *3 (W.D. Va. June 12, 2015) (Conrad, J.) (quoting Leto v. World Recovery Servs., LLC, No. 3:14-cv-489, 2015 WL 1897060, *4–5 (W.D.N.C. Apr. 27, 2015)).

In Valdez, for example, the court awarded the plaintiff only part of the actual damages she sought for emotional distress, reasoning that she did not provide "a declaration or other evidence detailing her specific emotional injuries or how those injuries have hampered her life." Valdez, 2015 WL 3661102, at *3. The court further explained that it did not believe "that a single boilerplate allegation, without more, supports a[] significant award of actual damages under the FDCPA." Id.

Here, in addition to submitting a declaration stating that the repossession caused her "extreme stress," "anger," "substantial emotional distress," and "inconvenience," ECF No. 13-1, Shelton also testified at length regarding the significant emotional toll of the repossession, including the worry and anxiety associated with the loss of her single mode of transportation as she approached the final days of her pregnancy. Her sister, Alexandria King,

10

also testified that Shelton was "panicking" and "crying hysterically" when Shelton called King during the repossession. King recalled that Shelton had "worked really hard" to save enough money to afford the car, finally providing Shelton with consistent access to transportation for work and medical appointments that she had not previously had. King testified that Shelton's pregnancy amplified the stress and anxiety that she endured, sending Shelton into a "panic" over the need to arrange rides for the birth. King testified that Shelton's panic and worry endured for at least a month following the repossession. Accordingly, in light of the considerable testimony that the court heard regarding the emotional toll of the incident on Shelton, and given that evidence "concerning emotional distress is, by its very nature, not necessarily susceptible to precise quantification," Carter, 2009 WL 1010851, at *4, the court finds that an award of $3,000 for emotional distress and anguish is appropriate.

Shelton also seeks $6,423.28 in actual damages for the loss of the equity in the Jeep at the time of repossession. Shelton asserts that the value of the Jeep at the time of repossession was $7,950, based on JD Power's Official Older Used Car Guide for September to December 2021. Pl.'s Decl., ECF No. 13-1, at ¶ 5.[3] She then states that she made six payments of $190.84 each toward the loan for a total of $1,145.04, id. at ¶ 2, and that the balance on the loan at the time of repossession was $1,526.72, id. at ¶ 4. Therefore, she concludes that the equity she lost in the Jeep at the repossession was $6,423.28 ($7,950 – $1,526.72). The court finds that Shelton has adequately established the actual damages she sustained for the loss of equity in the Jeep

---

[3] At the hearing, the court took judicial notice of the JD Power guide as a source of information as to the value of the Jeep.

and will award Shelton a total of $9,423.28 in actual damages ($6,423.28 for the loss of equity and $3,000 for emotional distress) under the FDCPA claim.

Shelton also asks the court to award $1,000 in statutory damages, the maximum amount available under the FDCPA. In determining the appropriate amount of statutory damages, the court must consider three factors: "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b)(1). The court finds that, while the frequency of noncompliance by Marshall was minimal (only one incident), the noncompliance was egregious and intentional. The evidence establishes that Marshall forcibly towed Shelton's Jeep across her yard, over Shelton's repeated objections (requiring the support of law enforcement to subdue her) and with only a handwritten note from Barnikow to justify his actions. Accordingly, the court will order that Marshall pay $1,000 in statutory damages.

Because the court has determined that Shelton successfully established a claim under the FDCPA, it will also award the plaintiff reasonable attorney's fees and costs. Barre v. DCN Holdings, Inc., No. 7:20-CV-00416, 2022 WL 1785301, at *1 (W.D. Va. June 1, 2022) ("The FDCPA permits the award of reasonable attorney's fees, as determined by the court, for any successful action." (citing 15 U.S.C. § 1692k)); see also Coles v. Land's Towing & Recovery, Inc., No. 3:10-CV-025, 2010 WL 5300892, at *4 (E.D. Va. Dec. 22, 2010) ("Attorney's fees are mandatory under the FDCPA, but the amount of the award is left to the district court's discretion."). The court will determine the amount of that award in a separate order following further briefing from Shelton's counsel, which should include proper documentation

reflecting the number of hours spent on the case along with reasonably detailed descriptions of legal tasks performed.

## B. TILA

Shelton next alleges that Trader Ricks violated the Truth in Lending Act ("TILA") for failing to provide several required disclosures in the financing agreement at the time of purchase. Compl., ECF No. 3, at ¶¶ 66–73. TILA is a consumer protection statute that was enacted to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

To achieve this purpose, TILA "requires creditors who engage in closed-end consumer credit transactions to disclose a long list of items" before the credit is extended. Hummel v. Hall, 868 F. Supp. 2d 543, 548–49 (W.D. Va. 2012) (Moon, J.) (citing 15 U.S.C. §§ 1638(a), (b)(1)); see also Gilbert v. Residential Funding LLC, 678 F.3d 271, 276 (4th Cir. 2012) ("TILA requires that a creditor make certain material disclosures at the time the loan is made."). TILA also requires that the disclosures "be conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization." 15 U.S.C. § 1638(b)(1); see also 12 C.F.R. § 226.17(a)(1) ("The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.").

Here, Shelton alleges that Trader Ricks failed to satisfy its disclosure obligations under TILA because the Retail Installment Sales Contract, which she received at the time of purchase, lists either zeros or "n.a." for several mandatory terms, including the "finance

charge," the "annual percentage rate," the "total of payments" (which is the sum of the amount financed and the finance charge), the number, amount, and due dates of payments scheduled to repay the total of payments, and the "total sale price" (which is the total of the cash price of the property, additional charges, and the finance charge). See 15 U.S.C. § 1638(a)(3)–(7); Exh. B, ECF No. 3-3. Fittingly, this section of the sales contract is titled, "Federal Truth in Lending Disclosures." Exh. B, ECF No. 3-3, at 1.

However, Shelton acknowledges that she also received at the time of purchase a document called "Payment Schedule," which lists "APR," "Amt Fin," and "Fin Charge," along with a numbered list of payments and their due dates. Exh. 1, ECF No. 13-2. Shelton contends that the Payment Schedule does not cure Trader Ricks' disclosure failings because the terms in that document conflict with those in the Retail Installment Sales Contract, running afoul of TILA's mandate that disclosures be made clearly and conspicuously.

"Whether a disclosure is clear and conspicuous is a question of law," Warford v. Memphis City Emps. Credit Union, No. 219-cv-2403, 2020 WL 4819952, at *5 (W.D. Tenn. Aug. 19, 2020), and "[t]he adequacy of a lender's disclosure is determined on an objective standard." Dillard v. Thomasville Auto Sales, LLC, 221 F. Supp. 3d 677, 682 (M.D.N.C. 2016) (citing Larrabee v. Bank of America, N.A., 714 F. Supp. 2d 562, 567–68 (E.D. Va. 2010)). Accordingly, "[i]f a reasonable consumer could plausibly interpret a TILA disclosure in more than one way, the lender has not complied with TILA." Dillard, 221 F. Supp. 3d at 682 (citing Larrabee, 714 F. Supp. 2d at 568). In Larrabee, for example, the court concluded that, while a "hypertechnical view" of TILA's clear and conspicuous standard may not be inappropriate, the plaintiff's allegation that she received two documents that "clear[ly] contradict[ed]" one

another was sufficient to state a claim under TILA at the motion to dismiss stage. Larrabee, 714 F. Supp. 2d at 569–70.

Similarly, here, Trader Ricks provided the Retail Installment Sales Contract to Shelton at the time of purchase, which stated that, "[b]y signing this contract, you choose to buy the vehicle on credit under the agreements on all pages of this contract," and, further, that the "Truth in Lending Disclosures below are part of this contract." Exh. B, ECF No. 3-3, at 1. The "Truth in Lending Disclosures" section, however, is filled with zeroes and "n.a." responses, and there is no indication that Shelton was supposed to refer to a separate document for additional and/or conflicting disclosures. Id.

The Payment Schedule, which Shelton also received at the time of purchase, contains an entirely different set of figures. Exh. 1, ECF No. 13-2. For example, the Retail Installment Sales Contract stated "$0.00" for the finance charge and "0%" for the annual percentage rate ("APR"), whereas the Payment Schedule showed an APR of 10% and finance charge of $159.76. However, even assuming that the Payment Schedule could satisfy Trader Ricks' TILA disclosure obligations, the disclosures are deficient and incomplete.[4] Accordingly, Shelton has established Trader Ricks' liability under TILA.

TILA entitles a successful plaintiff to actual damages, statutory damages, and reasonable attorney's fees and costs. 15 U.S.C. § 1640(a); see also James v. Delta Motors, LLC, 672 F. Supp. 3d 155, 165 (W.D. Va. 2023) (awarding actual damages, statutory damages, and

---

[4] The disclosures are deficient because they are not accompanied by "descriptive explanations" of each term, as required by TILA. 15 U.S.C. § 1638(a)(8) ("[T]he creditor shall disclose . . . [d]escriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau."). Furthermore, Trader Ricks failed to disclose the "total of payments" (the sum of the amount financed and the finance charge) and the "total sale price" (the total of the cash price of the property, additional charges, and the finance charge). See 15 U.S.C. § 1638(a)(5), (7).

attorney's fees under TILA). A creditor who violates TILA is, in an individual action, liable for "twice the amount of any finance charge in connection with the transaction." 15 U.S.C. § 1640(a)(2)(A)(i). Here, Shelton notes that, while the Retail Installment Sales Contract listed the finance charge as $0, the Payment Schedule indicates that the finance charge was $159.76. Pl.'s Mem. Supp. Motion for Default J., ECF No. 13, at 5 ("If this is indeed the finance charge, statutory damages are two times the finance charge or $319.52."). Accordingly, the court will use the finance charge provided in the Payment Schedule and award Shelton $319.52 in statutory damages against Trader Ricks. Shelton is also entitled to "the costs of the action, together with a reasonable attorney's fee," to be determined in a separate order by this court.[5]

### C. Conversion

Shelton also alleges that Trader Ricks and Marshall intentionally and wrongfully took control of Shelton's car and deprived her of possession, which constitutes the tort of conversion under Virginia law. Compl., ECF No. 3, ¶¶ 99–105. In Virginia, conversion "encompasses 'any wrongful exercise or assumption of authority over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.'" United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 305 (1994) (quoting Universal C.I.T. Credit Corp. v. Kaplan, 198 Va. 67, 75 (1956)) (alterations omitted). A properly asserted claim for conversion will show "1) the ownership or right to possession of the property at the time of the conversion and 2) the

---

[5] TILA permits a plaintiff to recover for "any actual damages sustained . . . as a result of" the creditor's failure to comply with TILA. 15 U.S.C. § 1640(a). While Shelton has established that Trader Ricks violated TILA, the actual damages she pleads stem from Trader Ricks' repossession of the Jeep, which was not a result of its failure to comply with TILA. Accordingly, the court will not award compensatory damages to Shelton under her TILA claim.

wrongful exercise of dominion or control by the defendant over the plaintiff's property, thus depriving plaintiff of possession." Adkins v. Crown Auto, Inc., No. 4:04-cv-042, 2005 WL 1278948, at *4 (W.D. Va. May 27, 2005) (quoting Airlines Reporting Corp. v. Pishvaian, 155 F. Supp. 2d 659, 664 (E.D. Va. 2001)).

Here, Shelton has alleged that she held title to the Jeep, that neither Trader Ricks nor Marshall had a current right to possession of it, and that Trader Ricks and Marshall dispossessed Shelton of it when Marshall towed it over Shelton's objections. Accordingly, Shelton has stated a claim for conversion against both defendants. She asks for actual damages in the amount of $11,423.28, as discussed above, and punitive damages of $57,116.40 (five times the amount of actual damages).

Under Virginia law, punitive damages are available for intentional torts, including conversion.[6] See e.g., Bhutta v. DRM Constr. Corp., No. 3:22-cv-288, 2023 WL 3901800, at *2 (E.D. Va. June 8, 2023) (citing O'Connell v. Bean, 263 Va. 176, 180, 556 S.E.2d 741, 743 (2002)); Gordon v. Pete's Auto Serv. of Denbigh, Inc., 637 F.3d 454, 460 (4th Cir. 2011) (citing Avocet Dev. Corp. v. McLean Bank, 234 Va. 658, 364 S.E.2d 757, 762 (1988)). However, an award of punitive damages is "allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc., 281 Va. 561,

---

[6] Shelton is also entitled to an award of compensatory damages, including for emotional suffering, under Virginia law for conversion. See Gordon v. Pete's Auto Serv. of Denbigh, Inc., 637 F.3d 454, 460 (4th Cir. 2011) (citing Avocet Dev. Corp. v. McLean Bank, 234 Va. 658, 364 S.E.2d 757, 762 (1988)); see also Kovari v. Brevard Extraditions, LLC, 461 F. Supp. 3d 353, 389 (W.D. Va. 2020) ("[I]n cases involving intentional torts, recovery of damages for emotional suffering . . . is permissible" under Virginia law.). Accordingly, the court will enter judgment of actual damages in the amount of $9,423.28 against Trader Ricks and Marshall, jointly and severally, under this claim.

580, 709 S.E.2d 163, 174 (2011) (quoting <u>Giant of Va., Inc. v. Pigg</u>, 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967)); <u>see also</u> <u>PGI, Inc. v. Rathe Prods., Inc.</u>, 265 Va. 334, 346, 576 S.E.2d 438, 444 (2003) (concluding that punitive damages are appropriate if "the conduct in question was so willful and wanton as to show a conscious disregard for the rights of others").

While "[i]ll will is not a necessary element," the "act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." <u>PGI, Inc.</u>, 265 Va. at 346, 576 S.E.2d at 444 (quoting <u>Baker v. Marcus</u>, 201 Va. 905, 909–10, 114 S.E.2d 617, 620–21 (1960)). Under Virginia law, the purpose of punitive damages is "the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses." <u>PGI, Inc.</u>, 265 Va. at 346, 576 S.E.2d at 444.

In the context of repossession, the court would be hard-pressed to find conduct more deserving of punishment and deterrence than what it is faced with here. First, the alleged circumstances surrounding the repossession are alarming. Barnikow, who recognized by written agreement just nine days before the repossession that Shelton was current on her payments, exploited his power as the secured creditor for the Jeep by repossessing it anyway. Shelton testified that he did so not because of a misguided belief that she was in default, but rather in retaliation for a dispute between himself and Holloway over drug money. This conduct is even more disturbing given the perpetrator—Trader Ricks, via Barnikow, is in the business of selling cars, which the court assumes happens regularly via secured credit, to the public. <u>See</u> <u>Coalson v. Canchola</u>, 287 Va. 242, 252, 754 S.E.2d 525, 530 (2014) ("[A] defendant's conduct that endangers many is more reprehensible than conduct that only endangers a few." (citing <u>Philip Morris USA v. Williams</u>, 549 U.S. 346, 357 (2007)).

18

The manner in which Marshall executed the repossession is also concerning. Upon Marshall's arrival to Shelton's home, Shelton, eight months pregnant at the time, pleaded with Marshall to abandon the repossession attempt, explaining to him that she was current on her payments. Marshall, over Shelton's objections, refused to leave, persisted with the repossession, and even called law enforcement to subdue Shelton. Meanwhile, Marshall's seemingly sole source of authority justifying his authority to repossess the Jeep was a handwritten, typo-riddled note from Barnikow, which Marshall claimed was a "repossession order." Again, the court's concern over this conduct grows in light of the fact that Marshall seems to repossess vehicles for a living.

Accordingly, the repossession was egregious both because of the circumstances for which it came about and the way it was executed, and the court finds that punitive damages are appropriate in this case based on the need to punish Trader Ricks and Marshall and to deter other similarly situated parties from engaging in this type of conduct.

While there is "there is no precise or fixed standard for determining the amount of a punitive damages award" in Virginia, courts instruct that "the amount of punitive damages awarded should bear some reasonable relationship to the actual damages sustained and to the measure of punishment required." Price v. IMAK Grp., No. 2:08-cv-517, 2009 WL 10689462, at *3 (E.D. Va. Apr. 10, 2009) (citing Philip Morris Inc. v. Emerson, 235 Va. 380, 414, 368 S.E.2d 268, 287 (1988) and Johnson v. Hugo's Skateway, 974 F.2d 1408, 1418 (4th Cir. 1992)). In addition, "[t]he Supreme Court has repeatedly stated that ratios between actual or potential harm and punitive damages should generally be within single digits to satisfy due process

requirements." <u>Coalson</u>, 287 Va. at 252, 754 S.E.2d at 530 (citing <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 425 (2003)).

Shelton seeks punitive damages of $57,116.40, five times the amount of actual damages that she is requesting. However, the court finds that a punitive damages award of $28,269.84, which is three times the amount of actual damages that the court is awarding, is sufficient and, for the reasons stated above, bears "some reasonable relationship to the actual damages sustained and to the measure of punishment required." <u>Price</u>, 2009 WL 10689462, at *3.

### D. Virginia Uniform Commercial Code

Finally, Shelton pleads two violations of the Virginia Uniform Commercial Code ("VUCC") against Trader Ricks: (1) repossession in breach of the peace and prior to default (in violation of Va. Code §§ 8.9A-601, 609(b)(2)) and (2) failure to dispose of the Jeep through a sale when Shelton had paid over 60% of the purchase price (in violation of Va. Code § 8.9A-620(e)).

Put simply, Trader Ricks' repossession of Shelton's Jeep because of a dispute between the owner of Trader Ricks and her then-boyfriend over drug money violates a variety of VUCC provisions, for which Shelton is entitled to damages. First, a secured party is only entitled to repossession upon the debtor's default. Va. Code § 8.9A-609 ("After default, a secured party may take possession of the collateral."); <u>see</u> <u>also</u> <u>Barnette v. Brook Rd., Inc.</u>, 457 F. Supp. 2d 647, 658 (E.D. Va. 2006) ("Typically, a secured creditor may not take possession of the collateral until the debtor defaults."); <u>Padin v. Oyster Point Dodge</u>, 397 F. Supp. 2d 712, 725 (E.D. Va. 2005) (granting the plaintiff's motion for summary judgment on his VUCC claim because the plaintiff was not in default when the dealership repossessed the vehicle). Shelton

has established that she was current on her payments for the Jeep under the financing agreement and the evidence confirms that Trader Ricks knew that. Accordingly, Trader Ricks' decision to repossess the Jeep for motivations other than Shelton's default is a flagrant violation of the VUCC.

Second, a secured party may repossess collateral without judicial process only "if it proceeds without breach of the peace." Va. Code § 8.9A-609(b)(2). While the VUCC does not define what conduct "breaches the peace," Virginia courts conclude that a creditor breaches the peace when it persists with a repossession over the debtor's objections. Wallace v. Chrysler Credit Corp., 743 F. Supp. 1228, 1232–33 (W.D. Va. 1990) (Williams, J.) ("If . . . the debtor is present and makes an objection, the breach of the peace analysis comes to the fore: the creditor's agent must then desist.").[7] Here, Shelton testified that she objected repeatedly to Marshall's repossession of the car, pleading with him to not go forward with it because she was current on her payments. Marshall continued with the repossession, not only disregarding Shelton's multiple objections but also calling law enforcement to force her to succumb. Accordingly, Trader Ricks, through its agent, breached the peace in violation of the VUCC.

Third, the VUCC provides that a secured creditor must dispose of (i.e., sell) the collateral where, as here, "sixty percent of the cash price has been paid." Va. Code

---

[7] The Wallace court cited a Virginia Supreme Court case to support this principle. In Universal Credit Co. v. Taylor, the court stated,

> The right to possession of chattels may be exercised without recourse to the courts, provided this can be done peaceably. It is only when a right of one is denied or resisted by another, that such party must resort to appropriate legal proceedings to enforce that right.

164 Va. 624, 630–31, 180 S.E. 277, 280 (1935).

§ 8.9A-620(e)(1).[8] Accordingly, Trader Ricks' accepting of the car in full satisfaction of the debt violated the VUCC, depriving Shelton of her right to collect the proceeds from the sale or exercise her right of redemption. Va. Code § 8.9A-620.

Under the VUCC, a successful plaintiff may recover statutory damages in "an amount not less than the credit service charge plus ten percent of the principal amount of the obligation or the time-price differential plus ten percent of the cash price," in addition to actual damages. Va. Code § 8.9A-625. Here, the Payment Schedule states that the credit card service charge was $159.76, and the amount financed was $2,512, ten percent of which is $251.20. Exh. 1, ECF No. 13-2. Accordingly, the court will award $410.96 in statutory damages against Trader Ricks.[9]

## IV.

For the foregoing reasons, Shelton's motion for default judgment, ECF No. 12, is **GRANTED**. The court enters judgment in the following amounts: actual damages of $9,423.28 against both defendants, jointly and severally; $1,000 in statutory damages under the FDCPA against Marshall; $319.52 in statutory damages under TILA against Trader Ricks; $410.96 in statutory damages under the VUCC against Trader Ricks; and punitive damages in the amount of $28,269.84 stemming from the conversion claim against both defendants,

---

[8] Shelton made a down payment of $3,500 at the time of purchase and made six payments of $190.84 each toward the loan (a total of $1,145.04). This means that Shelton had paid 77% of the cash price at the time of repossession. Alternatively, Barnikow claimed in his handwritten notice to Shelton that she owed Trader Ricks $2,252.20, including late fees, the cost of repossession, and storage. Exh. C, Exh. 3-4. Thus, even using that figure, Shelton paid 62% of the cash price ($6,000 – $2,252.20), and it was improper for Trader Ricks to accept the Jeep in full satisfaction of the debt.

[9] As already addressed, the court is entering a judgment against both defendants jointly and severally for actual damages. Accordingly, the court will not award duplicative actual damages to Shelton for the VUCC claim.

jointly and severally. The court will also award attorney's fees and costs by separate order following further briefing by Shelton's counsel. Lastly, pursuant to 28 U.S.C. § 1961(a), post-judgment interest will accrue at the current federal judgment rate.

An appropriate order will be entered.

Entered: March 19, 2024

Michael F. Urbanski
Chief United States District Judge

23